EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Next Step Medical Co., Inc.<br><br>Peticionaria<br><br>v.<br><br>Bromedicon, Inc.; Implantes &<br>Seguros Médicos, Inc. (ISMI);<br>y otros<br><br>Recurridos | Certiorari<br><br>2014 TSPR 30<br><br>190 DPR ____ |

Número del Caso: CC-2012-647

Fecha: 6 de marzo de 2014

Tribunal de Apelaciones: Región Judicial de San Juan

Abogados de la Parte Peticionaria:

> Lcdo. Luis A. Meléndez Albizu
> Lcdo. Luis Rosario Villanueva

Abogados de la Parte Recurrida:

> Lcdo. Jorge I. Pierats
> Lcdo. Jason R. Aguiló Suro

Materia: Ley de Contratos de Distribución – Injuction Bajo la ley 75 - 1964

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Next Step Medical Co., Inc.

    Peticionaria

       v.                   CC-2012-647      Certiorari

Bromedicon, Inc.; Implantes
& Seguros Médicos, Inc. (ISMI);
y otros

    Recurridos

Opinión del Tribunal emitida por el Juez Asociado SEÑOR ESTRELLA MARTÍNEZ

San Juan, Puerto Rico, a 6 de marzo de 2014.

A tenor con nuestra facultad de ser intérpretes máximos de las leyes, hoy reiteramos cuáles son los criterios rectores que el tribunal debe considerar para la concesión del remedio provisional dispuesto en el Art. 3-A de la Ley Núm. 75 de 24 de junio de 1964, conocida como Ley de Contratos de Distribución de 1964, *infra*.

Nuestros pronunciamientos jurisprudenciales sobre el mencionado remedio nos enfrentan a dos contenciones distintas en cuanto a su expedición. Por un lado, en Systema de P.R., Inc. v. Interface International, 123 D.P.R. 379

(1989), determinamos que los tribunales deben aplicar los criterios del *injunction* clásico, pero atemperados a los propósitos de la referida ley. Por su parte, en Cobos Liccia v. DeJean Packing Co., Inc., 124 D.P.R. 896 (1989), establecimos que no son necesariamente de aplicación todos los criterios del *injunction* tradicional. Empero, nunca hemos sido diáfanos en señalar cuáles son los criterios que deben gobernar la concesión del recurso extraordinario dispuesto en la Ley de Contratos de Distribución, acorde con el propósito que motivó al legislador a crear los remedios provistos en ésta.

Por tanto, hoy armonizamos las dos contenciones jurisprudenciales expuestas. Reiteramos que la petición del recurso interdictal del aludido esquema legal no debe examinarse rigurosamente al amparo de los requisitos establecidos para la concesión del *injunction* preliminar clásico. Ello, toda vez que su expedición está sujeta a un escrutinio judicial distinto, cónsono con la política pública que dimana de la mencionada ley.

Por entender que la parte promovente incumplió con los requisitos mínimos para la expedición del *injunction* preliminar del estatuto en cuestión, confirmamos el dictamen de los foros apelados.

Trabada la controversia en esos términos, procedemos a exponer los hechos que provocaron su génesis.

**I.**

Next Step Medical (Next Step o peticionaria) es una corporación debidamente organizada bajo nuestro ordenamiento jurídico. Se dedica, particularmente, a la distribución de equipo y productos médicos, así como a la representación de compañías especializadas en la manufactura de instrumentos vinculados a servicios hospitalarios. Por su parte, Bromedicon (recurrida) es una corporación foránea organizada bajo la legislación del estado de Pennsylvania. No obstante, desde enero de 2011, se encuentra debidamente registrada en el Departamento de Estado de Puerto Rico. Esta última corporación se dedica a ofrecer servicios de *neuromonitoreo intraoperativo* (neuromonitoreo) durante intervenciones quirúrgicas relacionadas al sistema nervioso.

En febrero de 2008, representantes de ambas corporaciones participaron en una conferencia sobre neurocirugía celebrada en Puerto Rico. En representación de Next Step acudió su presidente, el Sr. Jorge I. Dávila Nieves (Dávila), y en representación de Bromedicon compareció su director ejecutivo, el Sr. James M. Brogan (Brogan). Luego de entablar un diálogo sobre los servicios y ofrecimientos de ambas corporaciones, sus representantes exploraron la posibilidad de hacer negocios entre sí. Así, Dávila le expresó a Brogan la importancia de ofrecer servicios de neuromonitoreo en Puerto Rico, por lo que le propuso hacerlo a través de Next Step.

En ánimo de otorgarle formalidad al asunto, en marzo de 2008, Dávila se comunicó con la Lcda. Ivette Berríos Hernández para concertar una reunión entre todos los interesados. Una vez en la reunión, los representantes de ambas corporaciones le encomendaron a la licenciada Berríos Hernández la redacción del borrador del contrato que vincularía formalmente a ambas entidades. El 9 de mayo de 2008, la licenciada Berríos Hernández le envió a Dávila copia del borrador que incluía una cláusula de exclusividad en la que se reconocía a Next Step como único agente distribuidor de Bromedicon.[1]

Posteriormente, Dávila firmó el proyecto de contrato y el 7 de junio de 2008, lo remitió a Brogan. Este último nunca devolvió el mencionado documento y mucho menos hizo constar su aceptación. Así las cosas, Dávila le realizó cambios al documento preparado por la licenciada y el 30 de abril de 2009, se lo envió nuevamente a Brogan. Al igual que en la ocasión anterior, éste nunca respondió.

En noviembre de 2010, los representantes de ambas corporaciones volvieron a reunirse. En medio de la discusión, Dávila señaló que su empresa no iba a estar dispuesta a proveer los servicios de neuromonitoreo a médicos que en su práctica utilizaran dispositivos de la marca *DePuy*. El señalamiento de Dávila se fundamentó en la

---

[1] La licenciada Berríos Hernández nunca recibió contestación por parte de Next Step con respecto al borrador del contrato enviado.

existencia de un conflicto de naturaleza legal entre Next Step y la empresa manufacturera de la referida marca.

Brogan se opuso tenazmente a la condición propuesta por Dávila. Sostuvo que actuar en conformidad con la condición de Dávila constituiría una limitación injustificada de su oferta a pacientes y médicos. Afirmó, entonces, que continuaría ofreciendo los servicios de neuromonitoreo según le fueran solicitados, independientemente de la marca de los instrumentos utilizados por los médicos en el ejercicio de su práctica. Si bien Dávila sostuvo su postura, durante la reunión nunca aludió a la existencia de un contrato de exclusividad entre Next Step y Bromedicon.

Durante el 2010, al tiempo en que Next Step fungía como su distribuidor, sin mediar un contrato escrito, Bromedicon comenzó a ofrecer servicios de neuromonitoreo a través de otras entidades. Una vez Dávila advino en conocimiento de tal situación, le expresó su disconformidad a los gerenciales de la recurrida. Asimismo, durante una reunión que las partes sostuvieron, manifestó una vez más su desacuerdo con respecto a que Bromedicon llevara a cabo negocios con otras compañías. En consecuencia, exigió que los términos del vínculo entre las corporaciones se pusieran por escrito y que, a su vez, se firmara un acuerdo de exclusividad. El 4 de abril de 2011, en respuesta a la petición de Dávila, Bromedicon envió una carta en la cual se limitó a expresar que Next Step era una distribuidora

autorizada a ofrecer los servicios provistos por la recurrida. Nada se expresó en la referida carta con respecto al reconocimiento de la exclusividad de la peticionaria para fungir como distribuidora de los servicios ofrecidos por Bromedicon.

Así las cosas, Next Step demandó a Bromedicon alegando incumplimiento de contrato y daños y perjuicios. En particular, adujo que la recurrida infringió el contrato de exclusividad que, supuestamente, había suscrito con ella. Además, alegó daños económicos por razón de la pérdida de negocio. Ante ello, Next Step solicitó que se concediera a su favor el remedio interdictal dispuesto en el Art. 3-A de la Ley Núm. 75 de 24 de junio de 1964 (Ley Núm. 75), 10 L.P.R.A. sec. 278 *et seq*. La peticionaria solicitó el mencionado remedio con el propósito de que la recurrida desistiera de las actuaciones de naturaleza comercial con otras entidades y diera crédito a la exclusividad alegada, hasta tanto se resolviera finalmente la controversia en cuestión.

Luego de varios trámites procesales, entre los que se encuentran asuntos dilucidados ante el Tribunal Federal para el Distrito de Puerto Rico (Corte de Distrito),[2] el 8 de agosto de 2011, Next Step presentó una *Moción informativa y solicitud de señalamiento de vista de*

---

[2] El 24 de mayo de 2011, Bromedicon presentó ante la Corte de Distrito un "Notice of Removal" trasladando los procedimientos a este foro. No obstante, el 26 de julio de 2011, el referido foro judicial emitió una orden

*injunction*. Después de ser pospuesta en varias ocasiones a solicitud de Next Step, la vista de *injunction* se celebró durante los días 26 y 27 de enero de 2012.

El 9 de febrero de 2012, el Tribunal de Primera Instancia, presidido por la Hon. Laureana Pérez Pérez, declaró no ha lugar la solicitud de *injunction*. El foro primario concluyó que la peticionaria no cumplió con los requisitos estatutarios y doctrinales para expedir ese remedio. Asimismo, determinó que a la peticionaria le era oponible la defensa de incuria. Ello, debido a la dilación en que, alegadamente, incurrió para hacer valer su reclamo. En desacuerdo con el dictamen emitido, Next Step solicitó reconsideración, pero fue denegada.

Inconforme, la peticionaria acudió ante el Tribunal de Apelaciones. El 23 de mayo de 2012, el foro apelativo denegó la expedición del recurso. No obstante su denegatoria, expresó en su Resolución que "de la evidencia ante nos sometida se desprende que, en efecto, [la peticionaria] incumplió con los criterios necesarios para que el remedio interdictal estatutario por ella solicitado fuera expedido a su favor".[3] Por tanto, el referido foro razonó que la peticionaria no demostró la existencia de un daño real e irreparable, ni probó que el interés público resultaría afectado de no autorizarse el *injunction* en

_____

devolviendo el caso de epígrafe ante el Tribunal de Primera Instancia.

[3]Resolución del Tribunal de Apelaciones de 23 de mayo de 2012, pág. 12.

cuestión. Asimismo, al igual que el foro primario, sostuvo que a Next Step le era oponible la defensa de incuria.

Oportunamente, la peticionaria presentó una moción de reconsideración ante el Tribunal de Apelaciones, pero fue declarada no ha lugar. El foro apelativo fundamentó su denegatoria en "la falta de evidencia suficiente para probar o demostrar que se cumplió, al menos, con los tres (3) requerimientos especiales, para ser acreedor del remedio provisional especial provisto por el Artículo 3 A de la Ley Núm. 75".[4] Inconforme con tal determinación, Next Step recurrió ante este Tribunal señalando la comisión de los siguientes errores:

> Erró el TA como cuestión de derecho al no expedir el auto de *certiorari* para revocar la denegatoria del TPI a conceder el remedio provisional especial del Art. 3-A de la Ley 75 solicitado por el demandante, cuando el TPI aplicó un criterio legal incorrecto para la concesión de este remedio especial estatutario.

> Erró el TA como cuestión de derecho al no expedir el auto de *certiorari* para revocar la determinación del TPI de que la prueba documental y testifical presentada por el demandante fue legalmente "insuficiente" para establecer un caso *prima facie* bajo el Art.3-A de la Ley 75.

> Erró el TA como cuestión de derecho al no expedir el auto de *certiorari* para revocar la denegatoria del TPI a conceder el remedio provisional especial del Art. 3-A por razón de incuria, en hechos donde la dilación se debió a las tácticas legales del demandado de trasladar el caso al foro federal y por su reclamo de inclusión de nuevas partes indispensables.

En medio de los trámites procesales, el Centro Unido de Detallistas (CUD) solicitó permiso a este Tribunal para

comparecer en calidad de *amicus curiae*. Esta Curia lo concedió y le ordenó al CUD presentar su alegato. Oportunamente, el CUD sometió su posición en relación a los errores planteados en el recurso de la peticionaria.

En su comparecencia, el CUD sostiene que hacen falta unas expresiones más claras y contundentes de este Tribunal, aclarando que el remedio provisional dispuesto en el Art. 3-A es de carácter especial al que no le aplican los criterios del *injunction* clásico enumerados en <u>P.R.T.C. v. Tribunal Superior</u>, 103 D.P.R. 200 (1975). Amparándose en normativa federal, el CUD nos solicita que descartemos los requisitos de demostrar daños irreparables y probabilidad de prevalecer en los méritos cuando aclaremos cuáles son los criterios medulares para la concesión del referido remedio.

En fecha de 26 de octubre de 2012, expedimos el recurso. Con el beneficio de la comparecencia de ambas partes y del CUD en calidad de *amicus curiae*, nos encontramos en posición de resolver.

**II.**

A fin de resolver la controversia ante este Tribunal, es menester hacer unas expresiones sobre los fundamentos jurídicos del *injunction* preliminar clásico y los criterios rectores para la concesión del mismo. Veamos.

Es norma firmemente establecida que el recurso extraordinario de *injunction* es un mandamiento judicial en

_____

[4]Resolución del Tribunal de Apelaciones de 14 junio de

virtud del cual se requiere que una persona se abstenga de hacer, o de permitir que se haga, determinada cosa que infrinja o perjudique el derecho de otra.[5] Este recurso fue adoptado del sistema de equidad inglés y se utiliza, principalmente, **en casos donde no hay otro remedio adecuado en ley.** Nuestro ordenamiento jurídico cuenta con tres modalidades de este tipo de recurso, a saber: el entredicho provisional, el *injunction* preliminar y el *injunction* permanente.

En lo que atañe al asunto ante nuestra consideración, el *injunction* preliminar o *injunction pendente lite* es un recurso que emite el tribunal antes de la celebración del juicio en su fondo y, de ordinario, posterior a la celebración de una vista en donde las partes tienen la oportunidad de presentar prueba en apoyo y oposición a la expedición del mismo. El objetivo principal de este recurso es mantener el estado actual de las cosas hasta tanto se celebre el juicio en sus méritos. Ello, con el propósito de que el demandado no promueva con su conducta una situación que convierta en académica la determinación que finalmente tome el tribunal. Eventualmente, el derecho sustantivo de que se trate se ventilará en un juicio plenario, como en cualquier otro tipo de acción.[6]

A su vez, el *injunction* preliminar va dirigido a

_____
2012, pág. 1.
    [5]32 L.P.R.A. sec. 3521.
    [6]Molini v. Corp. P.R. Dif. Púb, 179 D.P.R. 674, 689 n.12 (2010).

requerir o prohibir hacer determinado acto, con el objetivo de impedir que se causen perjuicios inminentes o menoscabos irreparables a alguna persona durante la pendencia del litigio.[7] Por tanto, el factor cardinal que gobierna la expedición de este remedio extraordinario, y que está estrechamente ligado a la doctrina de la equidad, es la existencia de una amenaza real de sufrir algún menoscabo para el cual no existe un remedio adecuado en la ley.

Ahora bien, la concesión de un *injunction* preliminar debe determinarse a tenor con ciertos criterios rectores. Así, nuestros pronunciamientos jurisprudenciales han establecido cuáles son los factores que el tribunal debe ponderar al momento de decidir si expide o deniega este tipo de recurso, a saber: (1) la naturaleza de los daños que puedan ocasionársele a las partes de concederse o denegarse el recurso; (2) su irreparabilidad o la existencia de un remedio adecuado en ley; (3) la probabilidad de que eventualmente la parte promovente prevalezca al resolverse el litigio en su fondo; (4) la probabilidad de que la causa se torne académica de no concederse el *injunction*; y (5) el posible impacto sobre el interés público del remedio que se solicita.[8] De igual forma, la Regla 57.3 de las de Procedimiento Civil, 32 L.P.R.A. Ap. V., R. 57.3, enumera los factores que el

---

[7] E.L.A. v. Asoc. de Auditores, 147 D.P.R. 669 (1999).
[8] *Véanse* VDE Corp. v. F & R Contractors, 180 D.P.R. 21 (2010); Mun. de Ponce v. Gobernador, 136 D.P.R. 776, 784 (1994); P.R.T.C. v. Tribunal Superior, 103 D.P.R. 200, 202 (1975).

tribunal debe considerar al decidir si concede o no la petición del mencionado recurso. Además de los factores enumerados, la regla procesal añade el criterio de diligencia y la buena fe con que ha obrado la parte peticionaria.[9]

Todos los requisitos anteriores, tanto los promulgados por la jurisprudencia como los enumerados en las Reglas de Procedimiento Civil, no son requisitos absolutos, sino directrices que dirigen al tribunal al momento de decidir si la evidencia presentada justifica la expedición del recurso. La concesión del remedio descansará en la *sana discreción* judicial, que se ejercerá al considerar tanto los intereses como las necesidades de las partes involucradas en el caso.[10] El

_____

[9] 32 L.P.R.A. Ap. V, R. 57.3.

[10] Mun. de Ponce v. Gobernador, *supra*, págs. 790-791.

mismo debe expedirse con mesura y únicamente ante una demostración de clara e inequívoca violación de un derecho. En atención a ello, la determinación del tribunal no se revocará en apelación, a menos que se demuestre que el foro abusó de su facultad.

**III.**

**A.**

Por la naturaleza de la controversia ante nuestra consideración, resulta imperativo examinar las disposiciones de la Ley Núm. 75, al igual que la finalidad principal por la cual se promulgó. Procedemos.

La Ley Núm. 75 está incuestionablemente revestida de una fuerte política pública. La inclusión del aludido estatuto a nuestro ordenamiento tuvo el propósito de armonizar los intereses y nivelar las condiciones de contratación de dos partes económicamente dispares, que se encuentran vinculadas por una relación de índole comercial que involucra la distribución. Ello, con el fin de lograr una razonable estabilidad en las relaciones de distribución en Puerto Rico y erradicar ciertas prácticas que, más allá de contribuir con la estabilidad económica, inciden sobre las expectativas legítimas que las partes vinculadas respectivamente ostentan. Conviene en este punto exponer, como invariablemente hemos hecho cada vez que hemos examinado esta ley, su Exposición de Motivos en donde queda plasmado el interés público que persigue la misma, a saber:

> El Estado Libre Asociado de Puerto Rico no puede permanecer indiferente al creciente número de

casos en que empresas domésticas y del exterior, sin causa justificada, eliminan sus distribuidores, concesionarios o agentes, o sin eliminarlos totalmente van gradualmente mermando y menoscabando el alcance de las relaciones previamente establecidas, tan pronto como dichos distribuidores, concesionarios o agentes han creado un mercado favorable y sin tener en cuenta sus intereses legítimos.

La Asamblea Legislativa de Puerto Rico declara que la razonable estabilidad en las relaciones de distribución en Puerto Rico es vital a la economía general del país, al interés público y al bienestar general, y en el ejercicio del poder policial, considera necesario reglamentar, en lo pertinente, el campo de dichas relaciones, para evitar los abusos que ciertas prácticas ocasionan.[11]

La Ley Núm. 75 fue diseñada con el propósito expreso de proteger los derechos legítimos de los distribuidores y remediar los perjuicios causados a éstos. Ello, en relación a las prácticas abusivas de principales que, sin justa causa, menoscaban arbitrariamente las relaciones contractuales con los distribuidores, tan pronto éstos crean un mercado favorable a sus productos y servicios.[12] El aludido esquema legal impide que un principal se apropie injustamente de la plusvalía de un negocio después de que un distribuidor local ha conquistado un mercado y una clientela a través de su gestión empresarial.

En mérito de lo anterior, reiteradamente hemos expresado que la Ley Núm. 75 crea una causa de acción a favor de los distribuidores para detener el incumplimiento

---

[11]La Exposición de Motivos de la Ley Núm. 75 se enmendó mediante la Ley Núm. 105 de 23 de junio de 1966. *Véase* Leyes de Puerto Rico (1966), pág. 348.

del principal y ser compensados en daños cuando, luego de introducir productos en el mercado y lograr su reconocimiento social y ventas suficientes, son despojados, sin justa causa, del negocio gestado. Entonces, dentro de su amplio marco de aplicación, la referida ley busca evitar la terminación arbitraria de un contrato de distribución, de forma tal que no resulte perjudicado el interés del distribuidor y, a su vez, la empresa manufacturera obtenga una ventaja injustificada a su favor.[13]

**B.**

En armonía con la política pública que persigue el estatuto examinado, la Ley Núm. 17 de 24 de mayo de 1971 (Ley Núm. 17), 10 L.P.R.A. sec. 278b-1, enmendó sus disposiciones para adicionar un remedio provisional. Si bien este remedio no formaba parte del primer esquema de la ley en cuestión, una vez introducido, se convirtió en uno de los remedios más significativos de la misma. Sin duda, la aprobación de la Ley Núm. 17 es otra de las medidas que contribuyen a evitar que se frustren los propósitos de la Ley Núm. 75.

Particularmente, el *injunction* preliminar de la Ley Núm. 75 surgió como respuesta de la Asamblea Legislativa al caso Félix A. Rodríguez, Inc. v. Bristol-Myers Co., 281 F.Supp. 643 (D.P.R. 1968). La controversia principal a la

---

[12]San Juan Merc. v. Canadian Transport Co., 108 D.P.R. 211 (1978).

[13]P.R. Oil v. Dayco, 164 D.P.R. 486 (2005); Systema de P.R., Inc. v. Interface International, 123 D.P.R. 379 (1989).

que se enfrentó la Corte de Distrito fue determinar si al amparo de esa ley un distribuidor podía ser acreedor de un remedio preliminar que tuviera el efecto de prolongar la relación *pendente lite* o, en otras palabras, obtener el cumplimiento específico del contrato hasta tanto se resolviera si medió justa causa para la terminación del vínculo contractual. Ante ese escenario, la Corte de Distrito resolvió la controversia contestando en la negativa.

Así las cosas, la Asamblea Legislativa se encaminó a disipar cualquier duda con respecto a las facultades de nuestros tribunales para conceder remedios provisionales en pleitos sobre contratos de distribución. Entonces, a través de la medida en cuestión, la Asamblea Legislativa estableció que los tribunales pueden conceder un remedio provisional o medida de naturaleza interdictal durante la pendencia de un litigio al amparo de la Ley Núm. 75. Esto, con miras a que se preserven o mantengan vigentes los términos de un contrato de distribución en lo que el tribunal evalúa los méritos de la controversia. Mediante la aprobación de la Ley Núm. 17 quedó claramente establecida la discreción de los tribunales para otorgar remedios provisionales y así evitar la realización de actos que podrían producir daños irreparables, mientras se dilucida la existencia o no, de justa causa para la terminación de la relación contractual. *Véase*, Informe de la Comisión de Industria y Comercio del Senado sobre el P. de la C. 1275 y

el P. del S. 943 (25 Diario de Sesiones de la Asamblea Legislativa (Senado), pág. 831 (1971)).

Del historial legislativo de la Ley Núm. 17 se desprende que mediante la inclusión de una orden de remedio provisional, se podían "evitar serios disloques en negocios establecidos, y el consiguiente desempleo de numerosos empleados". *Véase*, Informe Conjunto de las Comisiones de Planificación, Comercio e Industria y Gobierno (25 Diario de Sesiones de la Asamblea Legislativa (Cámara), Parte III, pág. 1207 (1971)). En esencia, el remedio tiene el propósito de impedir que, mientras el tribunal determina si existe justa causa para la terminación del contrato, un distribuidor tenga que claudicar ante un suplidor económicamente poderoso. De esta forma, se evita el debilitamiento del distribuidor en esa etapa crucial del litigio, a la vez que se nivela el poder de las partes.[14] Como medida de auxilio, el remedio interdictal provisto en la ley equivale a un torniquete que impide que se desangre el distribuidor, mientras reclama los derechos consagrados en la misma.[15] De esta forma, el legislador refrendó e hizo valer los propósitos de la Ley Núm. 75, a la vez que promovió la estabilidad en las relaciones de distribución.

### C.

---

[14] Systema de P.R., Inc. v. Interface International, *supra*, pág. 387.

[15] Íd.

Con el firme propósito de garantizar la eficacia de los vínculos jurídicos contraídos al amparo de sus disposiciones, la Ley Núm. 75 dispone expresamente en su Art. 3-A que:

> En cualquier pleito en que esté envuelta directa o indirectamente la terminación de un contrato de distribución o cualquier acto en menoscabo de la relación establecida entre el principal o concedente y el distribuidor, **el tribunal podrá conceder durante la pendencia del pleito, cualquier remedio provisional o medida de naturaleza interdictal** para hacer o desistir de hacer, ordenando a cualquiera de las partes o a ambas a continuar, en todos sus términos, la relación establecida mediante el contrato de distribución, y/a abstenerse de realizar acto u omisión alguna en menoscabo de la misma. En todo caso en que se solicite el remedio provisional aquí provisto el tribunal considerará **los intereses de todas las partes envueltas y los propósitos de política pública** que informa este capítulo.[16] (Énfasis suplido).

El término *principal o concedente* se define en la ley como la "persona que otorga un contrato de distribución con un distribuidor".[17] El *distribuidor* es aquel realmente interesado "en un contrato de distribución por tener efectivamente a su cargo en Puerto Rico la distribución, agencia, concesión, o representación de determinada mercancía o servicio".[18] A su vez, el *contrato de distribución* es precisado como el vínculo establecido entre un distribuidor y un principal, mediante el cual, e

---

[16]Art. 3-A de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278b-1.

[17]Art. 1(c) de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278.

[18]Art. 1(a) de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278.

**independientemente de la forma** en que las partes nombren, caractericen, o formalicen ese vínculo, el primero se hace efectivamente a cargo de la distribución de una mercancía, o de la prestación de un servicio mediante la concesión o franquicia, en el mercado puertorriqueño.[19]

En el pasado, hemos interpretado estas definiciones a tenor con los objetivos de la Ley Núm. 75. En particular, la figura del distribuidor ha sido objeto de análisis por este Tribunal en reiteradas ocasiones. Ello, pues, es importante distinguir esta figura de otros intermediarios comerciales que no gozan de protección bajo la Ley Núm. 75. Entonces, por el talante acentuado de la política pública que busca proteger al distribuidor, debemos reproducir los pronunciamientos jurisprudenciales en donde hemos delimitado los rasgos que distinguen a esta figura de otros intermediarios del comercio. Así, hemos establecido que la figura del distribuidor:

> se identifica fundamentalmente por su gestión de crear un mercado favorable y conquistar una clientela para un producto o servicio mediante la promoción y conclusión de contratos de ventas. Su función comprende generalmente las actividades necesarias para la transferencia del fabricante al consumidor, o a algún punto intermedio entre ambos, de los productos o servicios que representa. La publicidad, la coordinación del mercado, las entregas de mercancía, los cobros, el mantenimiento de inventario y principalmente la promoción y conclusión de contratos de ventas son en términos generales obligaciones del distribuidor.[20] (Citas omitidas).

---

[19]Art. 1(b) de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278.

[20]San Juan Merc. v. Canadian Transport Co., *supra*, a la pág. 215; *véase*, también, Oliveras, Inc. v. Universal Ins. Co., 141 D.P.R. 900 (1996).

Aunque la creación del mercado y la conquista de una clientela son factores importantes para que se determine que una persona es un distribuidor, debemos aclarar que los criterios expuestos no constituyen una lista taxativa. Ninguno de esos criterios es determinante por sí mismo, ni tiene mayor peso o importancia que los demás. En consecuencia, el tribunal debe considerar los factores a la luz de la evidencia presentada.

Debemos mencionar que en Córdova & Simonpietri v. Crown American, 112 D.P.R. 797, 802 (1982), reconocimos que los distribuidores protegidos por la Ley Núm. 75 no sólo son los que distribuyen mercancías, sino también los que prestan servicio al principal. No obstante, reiteramos que no fue la intención del legislador extender la protección de la Ley Núm. 75 a todo intermediario del comercio. No es suficiente un mero contacto con el producto en el trayecto de éste pasar del principal al consumidor; se requiere algo más.

Por su parte, con respecto al contrato de distribución hemos señalado que es un contrato típico de los que se conoce como "de duración" o "de tracto sucesivo". El mismo se caracteriza por su continuidad y estabilidad y está inspirado, en gran medida, en el principio de confianza mutua. En este tipo de contrato cada empresario explota su

empresa, asume sus propios riesgos y busca su lucro personal.[21]

En lo pertinente al asunto ante esta Curia, es menester puntualizar que el legislador, al definir un contrato de distribución para efectos de la Ley Núm. 75, no circunscribió la aplicación del estatuto a los contratos de distribución exclusiva. Ni del texto de sus disposiciones, ni de su historial legislativo, aparece referencia a requisitos de exclusividad. Es decir, no se requiere exclusividad en la distribución de un producto o prestación de un servicio como requisito para ser acreedor de los remedios establecidos en el estatuto. Ello, pues, la aludida ley hace referencia a los contratos de distribución en general.

En consecuencia, hemos sostenido que "todo distribuidor que sea parte en un contrato de distribución, sea o no éste de carácter exclusivo, tendrá una causa de acción contra el principal que menoscabe o termine el contrato sin justa causa".[22] Por tanto, un distribuidor no exclusivo *está cobijado* a los fines de las disposiciones de la Ley Núm. 75.

**IV.**

**A.**

La doctrina interpretativa del mencionado Art. 3-A, ha delineado los contornos conforme a los cuales debe

---

[21]Medina & Medina v. Country Pride Foods, 122 D.P.R. 172, 187 (1988).

concederse una petición de tal naturaleza. En este contexto, hemos determinado que el análisis de la expedición del recurso, al ser de naturaleza estatutaria, requiere que se demuestre *prima facie* que el peticionario es un distribuidor y, por ende, que está cobijado por las disposiciones de la Ley Núm. 75. En gran medida, de ello dependerá la decisión de si procede el remedio interdictal solicitado y la probabilidad de que el peticionario prevalezca bajo la acción instada al amparo de esta ley.

Es determinante examinar el texto del contrato, o el acuerdo entre las partes, para establecer si se está, *prima facie*, ante la figura de un distribuidor. El examen debe ir dirigido a identificar las obligaciones establecidas, la intención de los contratantes y el fin que persiguió el contrato o el acuerdo. Por tanto, esta evidencia debe presentarse para que el tribunal se encuentre en posición de determinar si se trata de un distribuidor amparado por la Ley Núm. 75. Claro está, la parte promovente tiene el peso de la prueba.

Por su parte, al examinar nuestra doctrina jurisprudencial, nos percatamos de que hemos instruido a los tribunales a considerar, en el ejercicio de su discreción, los criterios del *injunction* clásico al momento de decidir si conceder o no la orden interdictal al amparo de la Ley Núm. 75. No obstante, ese ejercicio no debe realizarse con automatismo judicial. Ello, ya que si bien

_____

[22] P.R. Oil v. Dayco, *supra*, pág. 502.

el estatuto no impide la utilización de los criterios tradicionales para el *injunction*, la decisión del tribunal debe guardar estrecha compatibilidad con el espíritu de su intención legislativa.

Conforme al texto expreso del Art. 3-A, el tribunal, en la consecución de su facultad para expedir la orden provisional, está obligado a examinar los intereses y las equidades de las partes involucradas y los propósitos de la legislación. Debe hacerlo a través de un examen ponderado de la prueba sometida ante su consideración. De ahí que hemos sostenido que para la expedición del remedio provisional de la Ley Núm. 75, no son necesariamente de aplicación *todos* los criterios enumerados en el caso P.R.T.C. v. Tribunal Superior, *supra*.

Asimismo, la Corte de Distrito se ha expresado sobre la manera en que debe examinarse la petición de un interdicto preliminar al amparo de la Ley Núm. 75. En sus determinaciones, este foro judicial ha establecido que no es necesario aplicar todos los criterios del *injunction* tradicional al analizar una petición de ese remedio. A tales efectos, ha dictaminado que para su concesión no se requiere, necesariamente, la demostración de perjuicios irreparables o la probabilidad de prevalecer en los méritos. Medika Intern., Inc. v. Scanlan Intern., Inc., 830 F.Supp. 81 (D.P.R. 1993); Aybar v. F. & B. Mfg. Co., Inc.,

498 F.Supp. 1184 (D.P.R. 1980).[23] Por tanto, la Corte de Distrito ha concluido que la expedición del remedio requiere un tratamiento especial y debe concederse con *liberalidad*. Ello, en función, más que todo, de las consideraciones de política pública que persigue el estatuto en cuestión. Francisco Garratón, Inc. v. Lanman & Kemp-Barclay & Co., Inc., 559 F.Supp. 405 (D.P.R. 1983); Aybar v. F. & B. Manufacturing Co., Inc., *supra*.

El análisis que ha hecho la Corte de Distrito se utiliza, de manera persuasiva, para señalar cuáles criterios del *injunction* preliminar clásico deben demostrarse para que se expida el *injunction* de la Ley Núm. 75, y para reforzar la contención de que la concesión de éste no debe examinarse rigurosamente al amparo de los requisitos establecidos para el primero.

---

[23]*Véase*, también, P. Salamone, Puerto Rico's Distributors Law: Law 75: A Primer, 18 Rev. Jur. U.I.P.R. 67 (1983).

**B.**

Si bien nos reiteramos en las determinaciones jurisprudenciales expuestas, hoy tenemos ocasión para aclarar la normativa en virtud de la cual los tribunales, en el ejercicio de su discreción, pueden expedir el remedio interdictal provisto en el Art. 3-A. Respondemos, así, a la solicitud que hace el CUD de establecer expresiones más claras y contundentes con respecto a este asunto. Ello, para evitar que los foros judiciales continúen aplicando aisladamente, sin parámetros claros, los casos de Systema de P.R., Inc. v. Interface International, *supra*, y Cobos Liccia v. DeJean Packing Co., Inc., *supra*.

Como hemos señalado, el *injunction* preliminar de la Ley Núm. 75 surgió en virtud de una enmienda introducida por la Ley Núm. 17. En consecuencia, ese remedio no se encuentra bajo la jurisdicción de equidad del tribunal, sino que es de naturaleza propiamente estatutaria. Esto significa que su finalidad primordial es prevenir infracciones a las disposiciones de la ley y proteger la política pública que el estatuto está llamado a implantar. Por tal razón, el escrutinio con respecto a su expedición o denegatoria debe circunscribirse a determinar si el remedio cumple con las disposiciones y exigencias de la ley que regula los contratos de distribución.

Debido a su naturaleza, el *injunction* estatutario es independiente del *injunction* tradicional y, por consiguiente, generalmente exento de la normativa aplicable

a este último. Ello, pues, hemos establecido que los requisitos del *injunction* tradicional son más rigurosos que los exigidos para el *injunction* estatutario.[24] Por tanto, a diferencia del interdicto tradicional, la concesión de un *injunction* estatutario requiere un tratamiento especial, enmarcado dentro de un examen o escrutinio judicial más acotado.

Al examinar con detenimiento la doctrina jurisprudencial y la intención legislativa del Art. 3-A, notamos preocupación en el legislador en cuanto al impacto económico que supondría la aplicación *rigurosa* de los criterios que rigen la expedición del *injunction* clásico a la concesión del interdicto en cuestión.[25] Así las cosas, en conformidad con la política pública de la Ley Núm. 75, la Asamblea Legislativa incluyó en el mencionado artículo el mandato expreso de que al hacer el balance de equidades cuando se evalúa la conveniencia de expedir el remedio provisional, se examinen los intereses de las partes involucradas y los propósitos de la legislación.[26] Acorde con nuestros pronunciamientos con respecto al *injunction* estatutario, lo anterior descarta la aplicación rigurosa de la normativa aplicable al interdicto tradicional.

Sin duda, aunque la Ley Núm. 75 fue expresamente

---

[24]CBS Outdoor v. Billboard One, Inc., 179 D.P.R. 391, 409 (2010).

[25]Systema de P.R., Inc. v. Interface International, *supra*, pág. 387.

[26]Íd., págs. 387-388.

promulgada para proteger los intereses de los distribuidores, la concesión de su remedio extraordinario no puede ser automática. Reiteramos, entonces, que si bien los criterios rectores para la expedición del interdicto clásico no aplican estrictamente, esas disposiciones son guías para la expedición del remedio provisional de la Ley Núm. 75. No obstante, como hemos indicado, esas guías deben ser atemperadas a los propósitos de la aludida pieza legislativa. Es decir, deben conciliar con su política pública.

Conforme señalamos, el eje central del análisis debe ir dirigido, en primer plano, a establecer si la parte peticionaria demuestra que es un distribuidor. Luego, a tenor con el mandato legislativo, el juzgador debe examinar los intereses de las partes, conjuntamente con los propósitos de la política pública esbozada en la ley. Para ello, necesariamente, le corresponde a la parte promovente presentar prueba dirigida a demostrar la naturaleza de los daños que puede provocarle la denegatoria a expedir el remedio solicitado. A su vez, esta parte deberá probar el impacto en el interés público del recurso que solicita, así como las razones por las cuales se debe mantener vigente el vínculo comercial que posee con el principal, toda vez que de denegarlo la causa de acción se tornaría académica.

En esta etapa de los procedimientos no necesariamente es determinante presentar evidencia con respecto a los daños irreparables que supondría la no concesión del

remedio provisional aludido.[27] Ello, pues, la Ley Núm. 75, en su Art. 3, expresamente otorga un remedio adecuado cuando el distribuidor logra probar actos torticeros por parte del principal que menoscaban el acuerdo comercial entre ambos.[28] Por definición, el daño irreparable es aquel que no puede ser reparado mediante la utilización de los remedios legales.[29] Entonces, de la parte peticionaria prevalecer en su reclamación en los méritos, claramente tendría un remedio adecuado en ley para ser indemnizado por los perjuicios sufridos.

De igual forma, entendemos que en la vista de *injunction* del Art. 3-A, la parte peticionaria no tendría que forzosamente probar que no existió justa causa para el menoscabo del vínculo comercial. La razón de ello es que la vista de *injunction* no debe transformarse en un juicio en sus méritos. Precisamente, en armonía con los propósitos de la Ley Núm. 75, la falta de justa causa o no para la terminación, menoscabo o negativa a renovar un pacto comercial entre el principal y distribuidor es uno de los

---

[27]Nuestro ordenamiento jurídico ha contado con otros interdictos preliminares cuya concesión no necesariamente requiere probar todos los criterios a tomar en cuenta para la expedición del *injunction* clásico. *Véanse*, Plaza las Américas v. N. & H., 166 D.P.R. 631 (2005); A.R.P.e. v. Rivera, 159 D.P.R. 429 (2003); Pueblo v. Roig, 63 D.P.R. 18 (1944).

[28]Art. 3 de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278b.

[29] J. A. Cuevas Segarra, Tratado de Derecho Procesal Civil, 2da ed., Publicaciones JTS, T. V, 2011, pág. 1679. *Véase*, también, Misión Ind. P.R. v. J.P. y A.A.A., 142 D.P.R. 656, 681 (1997).

asuntos principales que deben dilucidarse en un juicio en sus méritos. Esto supone que en la vista de este recurso interdictal especial la parte promovente no tiene el deber de demostrar la probabilidad de prevalecer en el juicio en su fondo.

En este punto, afirmamos que el escrutinio expuesto no tiene el efecto de colocar al demandado en estado de indefensión. Reiteramos que en la correspondiente vista esta parte tiene la oportunidad de presentar su oposición. Además, debido a su naturaleza equitativa, el remedio del Art. 3-A permite la incorporación de las defensas clásicas tales como incuria, manos limpias e impedimentos.

En fin, debemos dejar meridianamente claro que los criterios del escrutinio judicial que hoy reiteramos *no constituyen un conjunto de requisitos absolutos*. Más bien, son directrices que dirigen la sana discreción del tribunal para determinar si la evidencia presentada justifica la concesión del recurso extraordinario. A su vez, señalamos que el escrutinio judicial desglosado es cónsono con el ejercicio de discreción que debe caracterizar el examen de una petición de *injunction* estatutario y con la liberalidad con la que deben concederse los remedios provistos en la Ley Núm. 75. En cuanto a ello, el Art. 4 de esta ley expresamente establece que:

> Las disposiciones del presente capítulo son de orden público y por tanto los derechos que tales disposiciones determinan no pueden renunciarse. **Este capítulo, por ser de carácter reparador, *deberá interpretarse liberalmente* para la más eficaz protección de tales**

**derechos**; en la adjudicación de las reclamaciones que surjan a su amparo, los tribunales de justicia reconocerán los referidos derechos a favor de quien efectivamente tenga a su cargo las actividades de distribución, no empece las estructuras o mecanismos corporativos o contractuales que el principal o concedente pueda haber creado o impuesto para encubrir la verdadera naturaleza de la relación establecida.[30] (Énfasis suplido).

**V.**

Al amparo de las elucidaciones estatutarias y jurisprudenciales expuestas, procedemos a resolver la controversia de epígrafe. En primer lugar, examinaremos si Next Step cumplió con el requisito de establecer, de manera *prima facie*, que reúne los criterios para ser considerada un distribuidor. Si de la evidencia presentada surge que la peticionaria es un distribuidor, pasaremos a la siguiente etapa del escrutinio. Es decir, procederemos a determinar si ésta logró exponer evidencia que incline la discreción del tribunal hacia la concesión

---

[30]Art. 4 de la Ley Núm. 75 de 24 de junio de 1964, 10 L.P.R.A. sec. 278c.

del recurso dispuesto en el Art. 3-A, a tenor con lo que hoy resolvemos.

Al analizar con rigor la transcripción de la vista de *injunction* y examinar detenidamente la prueba documental presentada por las partes, opinamos que Next Step cumple con los requisitos para ser considerado un distribuidor. La realidad operacional de la peticionaria, así como el acuerdo entre las partes y la manera como llevaban los negocios entre sí, sostienen esta contención.

De la prueba surge que la relación comercial de distribución entre Next Step y Bromedicon comenzó desde el 2008. Conforme lo acordado por las partes, la peticionaria comenzó a abrir el mercado en el País para introducir los servicios de la recurrida. Next Step le brindó publicidad a los mismos y generó las relaciones en la comunidad médica para su uso. Manejó, también, los términos de la contratación con los distintos médicos y hospitales que interesaban utilizar el neuromonitoreo. A su vez, participó en la coordinación de los casos en donde se daría este servicio. Asimismo, la peticionaria establecía el precio por los servicios de neuromonitoreo, y los clientes y planes médicos le hacían a ésta el correspondiente pago. A todas luces, a Next Step se le atribuye la creación de un mercado favorable y la ganancia de consumidores para los servicios de la recurrida.

A lo anterior se suma el hecho de que el 4 de abril de 2011, a solicitud de Next Step, la propia Bromedicon

suscribió un documento en el cual admitía que la peticionaria era un distribuidor autorizado de sus servicios en Puerto Rico. Por tanto, no existe duda con respecto a que la peticionaria es un distribuidor de Bromedicon. De esta forma, Next Step cumple con la primera etapa del escrutinio. Recordemos que en esta primera etapa no entraremos a considerar si el acuerdo pactado entre Next Step y Bromedicon tenía carácter de exclusividad. Como expusimos, éste no es un requisito para que apliquen las salvaguardas de la Ley Núm. 75 y, por consiguiente, del Art. 3-A. Basta con que la parte promovente demuestre que es un distribuidor.

Ahora bien, si la petición del remedio provisional está basada en el menoscabo sufrido como consecuencia de que el principal infringió un acuerdo de exclusividad con el distribuidor, como se alega en este caso, le corresponde a este último demostrar en la segunda parte del escrutinio el alegado carácter de exclusividad del pacto en relación a los demás criterios requeridos para la concesión del recurso. Pasemos, entonces, a la segunda parte del escrutinio establecido.

A tenor con nuestro examen, entendemos que aunque la peticionaria está cobijada bajo la figura del distribuidor, ésta no probó lo requerido para ser acreedora del remedio provisional dispuesto en la Ley Núm. 75. Examinada con detenimiento tanto la transcripción de la vista de interdicto como la evidencia presentada por las partes,

somos del criterio de que Next Step no pudo evidenciar con claridad los supuestos agravios ocasionados por el alegado menoscabo de Bromedicon al acuerdo de distribución entre ambas corporaciones. En todo caso, la prueba presentada por la peticionaria no estableció contundentemente el alegado derecho de exclusividad comercial a su favor y el cual aducía se había infringido. A todas luces, sus alegaciones no estuvieron debidamente respaldadas por la evidencia correspondiente.

De igual forma, el argumento de la peticionaria con respecto a que de no concederse el aludido *injunction* se vería afectado el interés público no nos persuade. De todos modos, fue Bromedicon quien en realidad trajo a colación el efecto nefasto que podría tener el remedio interdictal en el interés público. Entonces, al igual que lo determinó el foro apelativo intermedio, entendemos que circunscribir el mercado de la recurrida, bajo el alegado derecho de exclusividad argüido por la peticionaria, redundaría en restringirle innecesariamente a muchos médicos y, sobre todo, a pacientes su potestad de escoger qué compañía de instrumentación desean utilizar en sus procedimientos médico-hospitalarios. A su vez, Next Step tampoco demostró que su causa de acción contra la

recurrida se pudiera tornar académica de no concederse el recurso solicitado.

En mérito de lo anterior, es forzoso avalar la determinación de los foros apelados de denegar el interdicto en cuestión. No vemos cómo pudieron haber incidido en su dictamen. Por tanto, la razón no ampara a la peticionaria con respecto a su primer y segundo señalamiento de error. Ello, pues, el análisis realizado, enmarcado dentro de la liberalidad establecida para la petición de este tipo de recurso, desvirtúa los planteamientos de la peticionaria. El escrutinio judicial que hemos aplicado a la petición del interdicto es menos riguroso que el llevado a cabo por los foros apelados y ni aún así la peticionaria logró cumplirlo.

Así las cosas, no entraremos a considerar el tercer señalamiento de error, toda vez que Next Step no logró demostrar siquiera el cumplimiento con los requisitos mínimos para la expedición del referido recurso interdictal.

**VI.**

En virtud de los fundamentos expuestos, se confirman los dictámenes emitidos por los foros apelados. Empero, aclaramos que la determinación que hoy tomamos no dispone de la causa de acción de la parte peticionaria, toda vez que solo se están adjudicando los méritos del recurso interdictal solicitado. Por tanto, procede devolver el caso

al foro de instancia para la continuación de los procedimientos.


                              Luis F. Estrella Martínez
                                   Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Next Step Medical Co., Inc.

    Peticionaria


       v.                   CC-2012-647    Certiorari


Bromedicon, Inc.; Implantes
& Seguros Médicos, Inc. (ISMI);
y otros

    Recurridos


SENTENCIA

San Juan, Puerto Rico, a 6 de marzo de 2014.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de la presente Sentencia, se confirman los dictámenes emitidos por los foros apelados. Empero, aclaramos que la determinación que hoy tomamos no dispone de la causa de acción de la parte peticionaria, toda vez que solo se están adjudicando los méritos del recurso interdictal solicitado. Por tanto, se devuelve el caso al foro de instancia para la continuación de los procedimientos.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Martínez Torres concurre con la siguiente expresión: "El Juez Asociado señor Martínez Torres concurre, ya que la controversia del caso de epígrafe fue resuelta en Cobos Liccia v. DeJean Packing Co., Inc., 124 D.P.R. 896 (1989) y Systema de P.R., Inc. v. Interface International, 123 D.P.R. 379 (1989)". El Juez Presidente señor Hernández Denton se une a la expresión del Juez Asociado señor Martínez Torres. La Juez Asociada señora Rodríguez Rodríguez y el Juez Asociado señor Feliberti Cintrón concurren sin opiniones escritas.


                Aida Ileana Oquendo Graulau
             Secretaria del Tribunal Supremo